IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MICHAEL TEMPLE, M21297,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 20-cv-01343-DWD |
| | ) |
| **AUSTIN THOMPSON,** | ) |
| **ANTHONY SENN,** | ) |
| **Defendants.** | ) |

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Michael Temple, an inmate of the Illinois Department of Corrections (IDOC), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while incarcerated at Lawrence Correctional Center ("Lawrence"). Plaintiff alleges Anthony Senn and Austin Thompson ("Defendants") failed to protect him from assault by another inmate and caused him to incur physical and mental injuries. Defendants filed a timely Motion for Summary Judgment (Doc. 33) and Memorandum in Support (Doc. 34), and Plaintiff responded (Doc. 38). The matter is now ripe for review.

### PROCEDURAL HISTORY

Plaintiff initiated this case by filing a complaint on December 16, 2020. (Doc. 1). Upon initial review, the Court identified one valid claim:

> Claim 1:   Eighth Amendment claim for failure to protect against Senn and Thompson.

After review, the Claim was allowed to proceed against Defendants Senn and Thompson for monetary damages, but the Claim for injunctive relief was dismissed. (Doc. 9).

Defendants timely waived service of process and filed their answer on December 29, 2021 (Doc. 23). On March 15, 2022, counsel was appointed for Plaintiff. The case proceeded to merits discovery.

## FACTS

On September 22, 2019, Plaintiff's sister informed him that inmate Claudius Jackson had accused Plaintiff of snitching. When Plaintiff later approached Jackson at his cell to address this accusation, Jackson splashed Plaintiff with liquid from a hot pot. Although Plaintiff initially thought this liquid was water, he later came to believe it was urine and/or feces. Later that day, Plaintiff alleges he notified Defendant Senn that he needed to go to healthcare for testing because he believed Jackson had thrown "urine or something" on him.

On the morning of September 23, 2019, Plaintiff alleges he spoke to Defendant Thompson regarding rumors that he was calling Plaintiff a snitch and requested Defendant Thompson "please not do that because that could potentially jeopardize me." (Pltf. Dep., Doc. 34, Ex. A at 22). Plaintiff did not tell Defendant Thompson about Jackson specifically. (Pltf. Dep., Doc. 34, Ex. A at 23). Later that day, Defendant Thompson released Plaintiff and Jackson from their cells during "med pass" so that they could receive their medications.

After being released from his cell, Jackson walked downstairs Plaintiff and began threatening to kill him. While they were arguing at a distance, Plaintiff claims that

2

Defendant Thompson overheard, walked between Plaintiff and Jackson, shaking his head and stating, "come on guys, let's go." Defendant Thompson denies hearing any exchange between Plaintiff and Jackson. Furthermore, Defendants allege video footage directly contradicts this claim, while Plaintiff claims the video footage is of the following assault and not the preceding argument. Plaintiff claims Defendant Thompson then walked up to the second floor balcony, while Plaintiff and Jackson remained on the first floor. At the same time, Defendant Senn was located in the wing's foyer.

While Defendant Thompson was upstairs, a fight broke out between Plaintiff and Jackson. Jackson began swinging a homemade weapon at Plaintiff, who attempted to defend himself with closed-fist punches. Defendant Thompson observed the fight break out from the upstairs balcony and called a Code 10-10 on his radio to alert his sergeant, Defendant Senn. As Defendant Thompson headed downstairs, Defendant Senn entered the wing. Defendants unsuccessfully ordered Plaintiff and Jackson to stop fighting. Defendant Senn then deployed pepper spray to subdue the parties. Plaintiff dropped to the floor, and Defendant Thompson placed him in handcuffs. Defendant Senn followed Jackson to the front of the wing, ordered him on the floor, and placed him in handcuffs. Jackson had stabbed Plaintiff thirteen times. In addition to his physical injuries, Plaintiff claims he suffers ongoing mental distress because of the assault.

In support of the motion for summary judgment, Defendants submitted Plaintiff's deposition (Doc. 34, Ex. A), Defendant Senn's deposition (Doc. 34, Ex. B), Defendant Thompson's deposition (Doc. 34, Ex. C), and video footage from September 23, 2019 (Doc. 34, Ex. D). Plaintiff submitted Plaintiff's deposition (Doc. 38-1), Lieutenant Ochs'

Investigation Report (Docs. 38-2 and 38-3), Defendant Senn's deposition (Doc. 38-4), and Defendant Thompson's deposition (Doc. 38-5).

First, Plaintiff at his deposition testified that after Jackson splashed him with liquid on September 22, 2019, he approached Defendant Senn and stated he needed to go to health care to get tested because "Jackson threw something on me through to food port, I think it's urine or something." (Pltf. Dep., Doc. 38-1 at 14). Plaintiff claimed Defendant Senn "laughed it off" and told him to take a shower. (*Id.*). Plaintiff stated he had expected Defendant Senn to write an incident report so Jackson would be placed in segregated housing and the two would be separated from one another. (*Id.* at 16). Plaintiff did not discuss anything else with Defendant Senn regarding Jackson. (*Id.* at 15).

Before the assault on September 23, 2019, Plaintiff testified that he told Defendant Thompson that he heard Thompson was spreading rumors that Plaintiff was a snitch, and requested Thompson "please not do that because that could potentialize jeopardize me." (Pltf. Dep., Doc. 38-1 at 22). Plaintiff denied any recollection of telling Defendant Thompson he was in fear for his safety. (*Id.* at 24).

During the argument preceding the assault, Plaintiff testified that when Jackson was screaming that "he [was] going to stab me, kill me," Defendant Thompson saw them, "walked up and said 'Come on, guys.'" (*Id.*) Plaintiff further explained that Thompson then shook his head and walked up to the top deck, and at that point Jackson pulled out his knife. (*Id.* at 25). Plaintiff testified that Defendant Thompson was "supposed to either lock us in the cell or escort both of us to segregation" but instead "avoided the altercation." (*Id.*). While Thompson was upstairs, Plaintiff claimed that Jackson was

4

threatening him, saying "'I'm going to stab you. I'm going to kill you.'" (*Id.* at 35). Plaintiff claims Jackson's statements were within earshot of Defendant Senn. (*Id.* at 38). Plaintiff also testified that during the altercation, he repeatedly screamed "He's got a knife." *Id.* at 37-38). At the time Jackson began the assault, Plaintiff testified that Defendant Thompson was upstairs about 20 feet away, and Defendant Senn was in the foyer, approximately 50 to 75 feet away. (*Id.* at 36-37). Plaintiff testified that the entire assault lasted around one minute. (*Id.* at 26).

Next, Defendant Senn testified at his deposition that in situations where an inmate throws bodily fluids on another inmate acting as a porter, officers generally write a disciplinary ticket for an offending inmate, and the porter is "kept of that wing for a time" and would be checked out by medical. (Def. Senn Dep., Doc. 34, Ex. B at 58-59). Defendant Senn stated that he was unaware of an incident of bodily fluids being thrown on an inmate outside of restrictive or mental health housing. (*Id.* at 50-51). Furthermore, Defendant Senn stated that in the days leading up to the assault, he was unaware of Plaintiff and Jackson's interpersonal conflict and did not recall any conversations with Plaintiff. (*Id.* at 71).

At his deposition Defendant Thompson denied knowing that Jackson and Temple were having issues prior to the assault. (*Id.* at 68). Defendant Thompson also denied anyone coming to him in the days before the assault to complain that "there could be violence between [Plaintiff] and Jackson." (*Id.* at 86). Finally, Defendant Thompson testified that he did not hear Plaintiff and Jackson yelling prior to the fight on September 23. (*Id.* at 65). Defendant Thompson claimed that while he was upstairs running "med

5

pass," he saw Plaintiff and Jackson fighting, called for his sergeant (Defendant Senn) on the radio, and went downstairs to break up the fight. (*Id.* at 64).

## DISCUSSION

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). Courts generally cannot resolve factual disputes on a motion for summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### A. Deliberate Indifference

The Eighth Amendment's prohibition on cruel and unusual punishments requires prison officials to "take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Balsewicz*, 963 F.3d at 654 (7th Cir. 2020). A prison official's deliberate indifference to an inmate's substantial risk of serious harm violates the Eighth Amendment. *Farmer*, 511 U.S. at 828. Liability for deliberate indifference requires recklessness, "something more than

6

negligence" but "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 826. Deliberate indifference has both an objective and subjective component. *Balsewicz*, 963 F.3d at 654.

First, the objective component requires an inmate be exposed to an objectively serious harm. *Id.* As "prisons are inherently dangerous places," deliberate indifference requires more than a general risk of harm. *Morris v. Ley*, 331 F. App'x 417 (7th Cir. 2009) (citing *Brown v. Budz,* 398 F.3d 904, 909 (7th Cir.2005)). There must be a tangible threat to a prisoner's safety or well-being. *Id.* (citing *Grieveson v. Anderson,* 538 F.3d 763, 777 (7th Cir.2008)).

Second, the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to an inmate's health or safety. *Balsewicz*, 963 F.3d at 654 (citing *Farmer,* 511 U.S. at 837-38; *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020)). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" for subjective knowledge to exist. *Farmer*, 511 U.S. at 837. To establish an official's subjective knowledge, "a prisoner need not present direct evidence of the official's state of mind" and may instead use "inference from circumstantial evidence" *Id.* at 840; *see also Gevas v. McLaughlin,* 798 F.3d 475, 480 (7th Cir. 2015).

A prisoner often proves actual knowledge in a failure to protect case if he previously complained to officials about a specific threat to his safety. *Gevas*, 798 F.3d at 480 (citations omitted). A prisoner's complaint "that identifies a specific, credible, and imminent risk of harm and identifies the prospective assailant typically will support the

inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Id.* at 481. In contrast, "[c]omplaints that convey only a generalized, vague, or stale concern about one's safety will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id.* at 480-481; *see also, Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (upholding summary judgment where a prisoner told officers about a past altercation with three other inmates and his desire to transfer because he feared for his life, but did not tell them he had been threatened with future violence or that gang members perpetrated the past attack based on his non-gang affiliation); *Dale v. Poston*, 548 F.3d 563, 569-570 (7th Cir. 2008) (upholding summary judgment where a prisoner's vague statements to guards that other inmates were pressuring him and asking questions "were simply inadequate to alert officers to the fact that there was a true threat at play"). *But see Sinn v. Lemmon*, 911 F.3d 412, 422 (7th Cir. 2018) (finding summary judgment inappropriate where a prisoner told an official that he wanted to be moved to a different dorm after being relocated because he feared a second attack by a gang, because in addition to the vague complaint, the official also knew about the prison's prevalent gang violence, the prior attack by gang members on the prisoner, and that other victims from the first attack who had been relocated were also attached a second time).

      The Court will address each defendant individually. First, Defendant Senn argues that he is entitled to summary judgment because Plaintiff has failed to provide evidence he was "aware of a specific, impending, and substantial threat to Plaintiff's safety." (Doc. 34). Plaintiff did not discuss anything with Senn other than stating he needed to go to

8

healthcare to get tested because Jackson threw "urine or something" on him. Defendant Senn argues that Plaintiff did not state that "Jackson posed any threat to his safety, much less a substantial threat" or "even see the need to request protective custody." (*Id.*). Additionally, Defendant Senn claims he was neither aware of facts which would lead to an inference that Plaintiff faced a substantial risk of serious harm from an impending altercation with Jackson. (*Id.*).

Plaintiff disputes the statement that he never told Defendant Senn he was in fear for his safety, because in the moments immediately preceding and during the attack, Plaintiff yelled "to all witnesses thereto, including Defendant Senn, Jackson 'had a knife' and that he 'is stabbing me.'" (Doc. 38). Plaintiff also counters that immediately prior to the stabbing, Jackson said "within earshot of Defendant Senn, that he was going to stab Temple because he's a snitch." (*Id.*).

Summary judgment is inappropriate if Plaintiff has raised a genuine dispute of a material fact. Plaintiff's injuries from the assault were obviously serious, so the Court need not consider the objective component of the deliberate indifference analysis. The question of Senn's subjective knowledge remains. To survive summary judgment, Plaintiff must provide enough evidence for a jury to reasonably conclude Senn knew that Plaintiff faced a substantial risk of serious harm and then demonstrated deliberate indifference by failing to file an incident report or otherwise acting to separate Jackson from Plaintiff.

No reasonable jury could conclude Defendant Senn had subjective knowledge of a serious risk of substantial harm to Plaintiff. Although possibly approaching negligence,

9

Senn's conduct did not rise to the level of recklessness required for deliberate indifference because Plaintiff's statement lacked specificity to put Senn on notice that Plaintiff faced an ongoing serious risk of harm after Jackon threw his mixture. When Plaintiff complained to Defendant Senn that Jackson threw "urine or something" on him and requested to go to medical for testing, Senn laughed and told Plaintiff to take a shower. It is true that Senn did not follow standard procedures to send Plaintiff to medical and file an incident report, which likely would have separated Jackson from Plaintiff by either sending Jackson to segregated housing, or by assigning Plaintiff to a different unit as a porter. However, Plaintiff did not tell Senn about Jackson's threats, the snitch rumors, or that he feared for his safety. These circumstances were insufficient to put Defendant Senn on notice that Plaintiff faced an ongoing threat of harm. *C.f. Klebanowski*, 540 F.3d at 639-40; *Dale*, 548 F.3d at 569-70. Defendant Senn's failure to file an incident report and send Plaintiff to medical, although below the standard of care required under the circumstances, was not deliberate indifference.

Plaintiff's arguments that Defendant Senn knew of the threat to his safety in the moments preceding the attack are similarly unpersuasive. It is undisputed that Defendant Senn was in the foyer prior to Plaintiff's altercation with Jackson, and not within the main area of the housing unit. (Doc. 38). Even assuming Plaintiff's version of events, that Defendant Senn overheard Plaintiff and Jackson yelling through the closed foyer doors, he did not show deliberate indifference. Video footage of the assault shows Defendant Senn intervened within, at most, one minute. (Doc. 34, Ex. D). Again, no

10

reasonable jury could find Defendant Senn exhibited deliberate indifference in his response to the assault.

Plaintiff may be right that Jackson "was a cobra lurking in the grass; the objective prong is satisfied." *Dale*, 548 F.3d at 569. But deliberate indifference here turns on Senn's subjective state of mind, "and for all [Senn] knew, [Plaintiff] was being harassed by a garter snake." *Id*. Plaintiff has failed to demonstrate a genuine dispute of material fact regarding Defendant Senn's deliberate indifference. Therefore, summary judgment for Defendant Senn is appropriate.

Next, the Court will address summary judgment as to Defendant Thompson. First, Defendant Thompson argues Plaintiff never told him he was having issues with Jackson or that he feared for his safety. (Doc. 34). He states that Plaintiff also never requested protective custody prior to the assault. (*Id.*). Defendant Thompson denies overhearing any verbal exchanges between Jackson and Plaintiff prior to the assault. (*Id.*). Thompson also contends video footage directly contradicts Plaintiff's allegations that before Jackson pulled out the knife, Defendant Thompson saw them arguing, walked in between them and said "come on guys, let's go" before walking away up the stairs. (*Id.*). Thompson additionally argues that once he became aware of the fight, he called in a 10-10 on the radio and separated Plaintiff from Jackson. (*Id.*).

Plaintiff responds by claiming he informed Defendant Thompson the morning of the stabbing that he feared for his safety when he asked him not to spread rumors Plaintiff was a snitch that could "potentially jeopardize" him. (Doc. 38). Additionally, Plaintiff claims Lawrence did not have protective custody at the time these events took place, and

11

that Plaintiff had reason to believe that if he had requested protective custody, he would've been placed in administrative segregation. (*Id.*). Plaintiff reiterates his claims that immediately preceding and during the assault, he yelled out that Jackson had a knife and was stabbing him for all in the unit to hear. (*Id.*).

Plaintiff's conversation with Defendant Thompson the morning of the stabbing was too vague to establish the requisite knowledge required for deliberate indifference. In this conversation, Plaintiff requested Defendant Thompson not spread rumors about Plaintiff being a snitch "that could potentially jeopardize" him. (Pltf. Dep., Doc. 34, Ex. A at 22). Plaintiff did not mention Jackson specifically. (Pltf. Dep., Doc. 34, Ex. A at 23). However, "just because a correctional officer knows an inmate has been branded a snitch—and it's common knowledge that snitches face unique risks in prison—does not mean the officer violates the Constitution if the inmate gets attacked." *Dale*, 548 F.3d 563, 569-570. Had this been Defendant Thompson's only interaction with Plaintiff prior to the assault, he would be entitled to summary judgment. But it was not their only interaction.

In Plaintiff's version of events, Defendant Thompson overheard and briefly attempted to intervene in Plaintiff and Jackson's argument in the moments leading up to the stabbing. Defendants claim that these events are directly contradicted by the video tape, but Plaintiff allege that the video only shows the time period after Defendant Thompson walked upstairs. Interpreting the facts in favor of the plaintiff, a reasonable jury could conclude Defendant Thompson exhibited deliberate indifference by walking away from Plaintiff after overhearing Jackson's threats to stab and kill Plaintiff. Plaintiff

12

has sufficiently demonstrated a genuine dispute of a material fact surrounding Defendant Thompson's conduct to defeat summary judgment.

Based on the foregoing analysis, summary judgment will be denied for Defendant Thompson. If his story is true, Plaintiff was not a victim of the inherent, baseline dangerousness of prison life, but suffered injuries as a result of Defendant Thompson turning his back on Plaintiff as he faced an imminent and serious threat of harm from Jackson. *See Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002). "'If his story is true ...'— [P]laintiff is entitled to a trial, but of course the trier of fact may disbelieve his evidence, all or most of which comes from inmates, who tend not to be highly credible witnesses." *Case*, 301 F.3d at 607.

### B. Qualified Immunity

Defendants further assert they are entitled to summary judgment on the grounds of qualified immunity. Qualified immunity shields government officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Although qualified immunity is an affirmative defense, once a defendant invokes it, the burden shifts to the plaintiff to argue that it should not apply. *Holleman v. Zatecky*, 951 F.3d 873, 877 (7th Cir. 2020). On summary judgment, this court must decide (1) whether the facts that plaintiff has shown make out a violation of a constitutional right, and (2) whether the right at issue was "clearly established" at the time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also id.* at 236 (holding that courts may conduct these inquiries in either order).

When determining whether an official may use the qualified immunity defense, courts focus on "whether the officer had fair notice that his conduct was unlawful." *Balsewicz*, 963 F.3d at 656-57 (citing *Kisela v. Hughes*, 584 U.S. ----, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018)) (internal quotations and marks omitted). If any reasonable officer in [Defendants'] shoes. . . would have understood that taking no action to address th[e] danger violated [Plaintiff's] right, then the right is clearly established." *Id.* at 656. It is "a well-settled aspect of Eighth Amendment jurisprudence" that once a prison official becomes aware of a prisoner's danger of assault by another prisoner, it becomes the official's duty to protect the prisoner. *Gevas*, 798 F.3d at 484 (citing *Farmer*, 511 U.S. at 832-834); *see also Harris v. Molinero*, 803 F. App'x 1, 3 (7th Cir. 2020) ("[P]rison officials must not deliberately expose prisoners to known but easily avoided risks of violence from other prisoners").

Because summary judgment has already been granted for Defendant Senn, the Court only considers whether Defendant Thompson is entitled to the qualified immunity defense. Taking the facts in the light most favorable to the plaintiff, a factfinder could reasonably conclude Defendant Thompson violated Plaintiff's Eighth Amendment rights by failing to take reasonable measure to abate his assault. At the time of Plaintiff's attack, it was clearly established that when Defendant Thompson knew Plaintiff faced a specific danger of serious harm from Jackson, it was his duty to take reasonable measures to abate that danger. Accordingly, because there is a material issue of fact of whether Defendant Thompson attempted to intervene in the argument after overhearing Jackson's threats to stab plaintiff prior to the fight but walked away,

14

and that the video evidence in Defendants' Exhibit D shows the time period after this alleged intervention, the qualified immunity analysis also turns on this fact. Indeed, a reasonable jury could decide that Defendant Thompson overheard Jackson's threats, walked between Plaintiff and Jackson and said "Come on guys," and then walked away upstairs. Thus, the Court cannot resolve the issue of qualified immunity for Defendant Thompson at this stage; that question is for the jury. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (denying summary judgment "when the qualified immunity inquiry cannot be disentangled from disputed facts"); *accord Alicea v. Thomas*, 815 F.3d 283, 291–92 (7th Cir. 2016) ("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity.") (citations omitted).

## DISPOSITION

For the above-stated reasons, Defendants' Motion for Summary Judgment (Doc. 33) is **GRANTED as to Defendant Senn and DENIED as to Defendant Thompson.**

**IT IS SO ORDERED.**

DATED: March 5, 2024

/s *David W. Dugan*
_____
DAVID W. DUGAN
U.S. District Judge